# EXHIBIT A

*FTC v. Trudeau*, 579 F.3d 754, 756 (7th Cir. 2009)

conflict of interest. However, at oral argument, Hargrove requested to withdraw this claim. As he correctly noted, claims of ineffective assistance of counsel are disfavored on direct appeal because the factual foundation for such claims is often undeveloped. Hargrove requested the opportunity to build a more complete record for his claim and we granted his request to do so.

Hargrove's remaining claim is a challenge to the constitutionality of the mail fraud statute under which he was convicted. He contends that 18 U.S.C. § 1346 is void for vagueness because it does not define the criminal offense with sufficient definiteness such that ordinary people can understand what conduct is prohibited and, moreover, it encourages arbitrary and discriminatory enforcement. According to Hargrove, he could not have known that the conduct underlying his convictions could be considered to have deprived another of the "intangible right of honest services" under § 1346.

**[1, 2]**  The constitutionality of a statute is an issue of law which we review de novo. *United States v. Olofson*, 563 F.3d 652, 659 (7th Cir.2009). As Hargrove acknowledges, this Court has soundly rejected the claim that the mail fraud statute, as applied to an intangible-rights theory, is void for vagueness. *United States v. Hausmann*, 345 F.3d 952, 958 (7th Cir.2003); *United States v. Warner*, 498 F.3d 666, 697 (7th Cir.2007). In Hargrove's brief, he argues that the issue may be ripe for reconsideration in light of *United States v. Thompson*, 484 F.3d 877 (7th Cir.2007). However, he fails to posit any reason why *Thompson* conceivably could undermine *Hausmann*. *Thompson* did nothing to disturb the central holding of *Hausmann*, which is that the mail and wire fraud statutes, §§ 1341, 1343 and 1346, are not unconstitutionally vague, as applied under the intangible-rights theory.

At oral argument, Hargrove informed this Court that he has raised the claim solely for the purposes of preserving the issue in the event that the Supreme Court chooses to consider it at some future date. Fair enough.

For the foregoing reasons, we AFFIRM the judgment of the district court.



**FEDERAL TRADE COMMISSION, Plaintiff–Appellee,**

**v.**

**Kevin TRUDEAU, Defendant–Appellant.**

**No. 08–4249.**

United States Court of Appeals, Seventh Circuit.

Argued May 14, 2009.

Decided Aug. 27, 2009.

**Background:** After Federal Trade Commission (FTC) obtained permanent injunction barring weight-loss book's author/marketer from misrepresenting his products on television infomercials, FTC sought to hold marketer in contempt for violating injunction with respect to his book. The United States District Court for the Northern District of Illinois, 567 F.Supp.2d 1016, Robert W. Gettleman, J., entered order finding marketer in contempt, and subsequently denied his motion for reconsideration, 572 F.Supp.2d 919. Marketer appealed.

**Holdings:** The Court of Appeals, Tinder, Circuit Judge, held that:

(1) district court did not abuse its discretion in finding marketer in contempt, but

(2) remand was required for sanction.

Affirmed in part, vacated in part and remanded.

## 1. Antitrust and Trade Regulation ☞386

District court did not abuse its discretion in finding weight-loss book's author/marketer in contempt of permanent injunction obtained by Federal Trade Commission (FTC) barring him from misrepresenting content of his book during television infomercials; during infomercial, marketer described weight-loss program as "easy" and stated dieters could eat anything they wanted after completing program, but program required consuming numerous specific food supplements and 500-calories-per-day limit, and program's final phase lasted for rest of dieter's life.

## 2. Contempt ☞66(7)

The Court of Appeals reviews a district court's contempt finding for abuse of discretion, and will not reverse unless the result was clearly erroneous or unless it finds an abuse of discretion by the district court.

## 3. Contempt ☞60(3)

To succeed on a contempt petition, the complainant must demonstrate by clear and convincing evidence that the respondent violated an express and unequivocal command of a court order.

## 4. Contempt ☞20

A complainant seeking to hold a respondent in contempt of a court order must demonstrate that: (1) the order set forth an unambiguous command; (2) respondent violated that command; (3) respondent's violation was significant, meaning it did not substantially comply with the order; and (4) respondent failed to take

steps to reasonably and diligently comply with the order.

## 5. Antitrust and Trade Regulation ☞386

In action seeking to hold weight-loss book's author/marketer in contempt of permanent injunction barring him from misrepresenting book during television infomercials, remand was required for district court to make sufficient factual findings to substantiate its $37.6 million civil contempt sanction and to set forth procedures by which Federal Trade Commission (FTC) would reimburse book's consumers.

## 6. Contempt ☞3, 4, 70

Which form a contempt sanction takes, whether criminal or civil, depends on the character of the relief itself, not the subjective intent of the court.

## 7. Contempt ☞70, 74

Civil contempt sanctions can either compensate the complainant for his losses caused by the contemptuous conduct, or coerce the contemnor's compliance with a court order.

## 8. Contempt ☞72

Criminal contempt sanctions are flat, unconditional fines announced after a finding of contempt, where the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance.

## 9. Contempt ☞70, 81

Where a contempt fine is not compensatory, it is a civil sanction only if the contemnor is afforded an opportunity to purge, that is, avoid punishment by complying with the court order.

## 10. Contempt ☞70

Courts have broad discretion to fashion contempt remedies, and the particular remedy chosen should be based on the nature of the harm and the probable effect of alternative sanctions.

**11. Antitrust and Trade Regulation ⟺386**

In action seeking to hold weight-loss book's author/marketer in contempt of permanent injunction barring him from misrepresenting book during television infomercials, three-year ban from appearing in infomercials for any product was not coercive civil contempt sanction, since sanction did not provide marketer opportunity to purge through compliance with injunction.

**12. Contempt ⟺81**

A purgeable civil contempt sanction is one that allows the contemnor to free himself of the sanction by committing an affirmative act, namely complying with the court's order.

———————

C. Steven Baker, Attorney, Federal Trade Commission, Chicago, IL, Lawrence Demille–Wagman, Attorney (argued), Federal Trade Commission Office of the General Counsel, Washington, DC, for Plaintiff–Appellee.

Kimball R. Anderson, Attorney (argued), Lisa J. Parker, Winston & Strawn LLP, Chicago, IL, for Defendant–Appellant.

Before RIPPLE, MANION, and TINDER, Circuit Judges.

TINDER, Circuit Judge.

If you have a problem, chances are Kevin Trudeau has an answer. For over a decade, Trudeau has promoted countless "cures" for a host of human woes that he claims the government and corporations have kept hidden from the American public. Cancer, AIDS, severe pain, hair loss, slow reading, poor memory, debt, obesity—you name it, Trudeau has a "cure" for it. To get his messages out, Trudeau has become a marketing machine. And the infomercial is his medium of choice. He

has appeared in dozens of them, usually in the form of a staged, scripted interview where Trudeau raves about the astounding benefits of the miracle product he's pitching. But Trudeau's tactics have long drawn the ire of the Federal Trade Commission ("FTC"). By promoting his cures, Trudeau claims he is merely exposing corporate and government conspiracies to keep Americans fat and unhealthy. But the FTC accuses Trudeau of being nothing more than a huckster who preys on unwitting consumers—a 21st-century snake-oil salesman. For years Trudeau has dueled with the FTC in and out of court.

Trudeau's latest run-in concerns his cure for weight loss, which he explains in his book, *The Weight Loss Cure "They" Don't Want You to Know About.* By the time Trudeau began promoting the book, courts had sharply curbed his marketing activities. A consent decree banned Trudeau from appearing in infomercials for any products, except for books, provided that he did not "misrepresent the content of the book."

That proviso forms the basis for this latest lawsuit. The FTC claimed that Trudeau's *Weight Loss Cure* infomercial misled consumers by describing a weight loss program that was "easy," "simple," and able to be completed at home, when in fact it was anything but. The program requires a diet of only 500 calories per day, injections of a prescription hormone not approved for weight loss, and dozens of dietary and lifestyle restrictions. The district court sided with the FTC, concluded that Trudeau had misrepresented his book, and held Trudeau in contempt. As sanctions, the court ordered Trudeau to pay $37.6 million and banned Trudeau from appearing in any infomercials, even for books, for the next three years.

Trudeau appeals everything. He argues he should not have been held in contempt

because he merely quoted his book and expressed his opinions. And he contends that the court's sanctions were not appropriate for civil (as opposed to criminal) contempt proceedings. We disagree with Trudeau about the contempt finding—he clearly misrepresented the book's content—but we are troubled by the nature of both the $37.6 million fine and the infomercial ban. So we must remand those aspects of the court's judgment.

## I. Background

### A. Trudeau and the FTC

Trudeau's troubles with the FTC started over a decade ago. In 1998, the FTC sued Trudeau for deceptive practices and false advertising in connection with a variety of products that Trudeau promoted through his infomercials. For example, Trudeau participated in an infomercial for the "Sable Hair Farming System," which was guaranteed to regrow hair and "actually end hair loss in the human race." An infomercial for "Howard Berg's Mega Reading" claimed to significantly increase reading speed, up to as much as ten times, even for individuals with severe brain damage. And promoting his very own "Kevin Trudeau's Mega Memory System," Trudeau claimed that users would achieve a photographic memory.

Trudeau settled that case and paid $500,000 to compensate purchasers of these products. Trudeau also agreed not to make any representations about the benefits or performance of any product without "competent and reliable evidence" of his claims, and he agreed not to misrepresent the existence or contents of any research study. He further agreed to be up front about the fact that his infomercials were advertisements and not actual interviews. Stipulated Order for Permanent Inj. & Final J. Against Kevin Trudeau, *FTC v. Trudeau*, No. 98–CV–168 (N.D.Ill. Jan. 14, 1998).

But five years later, Trudeau was at it again. The FTC went after him for marketing two products: "Coral Calcium Supreme," as a cure for cancer, heart disease, multiple sclerosis, lupus, and many other serious ailments; and "Biotape," as a cure for severe pain. Trudeau even claimed that his cancer cure had been proven by an article in the Journal of the American Medical Association. The FTC again alleged deception and false advertising, and it sought to hold Trudeau in contempt for violating the 1998 injunction. In response, Trudeau stipulated to a preliminary injunction to cease marketing these products without first submitting the infomercials to the FTC. Stipulated Prelim. Inj. Order, *FTC v. Trudeau*, No. 03–CV–3904 (N.D.Ill. July 1, 2003) (R. 26.)

But that didn't stop him—he kept marketing Coral Calcium as a cure for cancer. So in June 2004, the court held Trudeau in contempt for violating the preliminary injunction and ordered him to cease marketing that product altogether. Contempt Order, *FTC v. Trudeau*, No. 03–CV–3904 (N.D. Ill. June 29, 2004) (R. 55.)

But Trudeau still wanted to promote his "cures." This time, though, instead of marketing the curative substances themselves, he sought to advertise his book, *Natural Cures "They" Don't Want You To Know About*, which reveals "natural cures" for everything from herpes and AIDS to MS and cancer. So Trudeau began negotiating with the FTC about a new stipulated agreement that would govern Trudeau's future marketing activities.

In September 2004, the court entered a Consent Order, which ordered Trudeau to pay $2 million for consumer redress and prohibited Trudeau from advertising any products in infomercials. But the Order contained an exception: Trudeau could participate in infomercials for publications, including his own publications, as long as the publication did not refer to any other

product Trudeau was marketing. In addition, and of particular importance to this case, the Order specifically provided that "the infomercial for any such book . . . must not misrepresent the content of the book." Stipulated Final Order for Permanent Inj. & Settlement, *FTC v. Trudeau*, No. 03–CV–3904 (N.D.Ill. Sept. 2, 2004) (R. 56.)

In connection with the 2004 Consent Order, Trudeau submitted to the FTC an infomercial for his *Natural Cures* book. Trudeau claims that this infomercial merely quoted and paraphrased his book and gave his personal opinion about topics in the book. The FTC viewed the infomercial and didn't object to it being put on the air. Over the next two years, Trudeau aired that and a number of other infomercials promoting several of his books.

In mid–2006, Trudeau's company, Trucom, LLC, sold all of its assets to ITV Global, Inc., an entity allegedly not-at-all affiliated with Trudeau. ITV agreed to pay Trucom $121 million. In exchange, Trudeau agreed that ITV may market his books and publications via infomercials and that Trudeau would appear in those infom-

ercials for the purpose of promoting those books. Trudeau attests he would not receive any additional compensation for those appearances beyond the $121 million. But Trudeau claims that Trucom has received only $2 million of that $121 million from ITV.

**B. The *Weight Loss Cure* Infomercial**

Trudeau was on good terms with the FTC until 2007, when he appeared in infomercials promoting his *Weight Loss Cure* book. The *Weight Loss Cure* book touts a four-phase program to permanently shed pounds:[1]

● **Phase One** lasts 30 days and consists of a list of 60 dos and don'ts, dozens of which the book claims dieters "MUST" follow.[2] Among other things, dieters are advised to eat an all-organic diet of six meals per day; eat 100 grams of organic meat just before bed; not eat any food cooked in a microwave; receive 15 "colonics" (a procedure like an enema with water performed only by specialists); walk an hour a day; take infrared saunas; and avoid all skin creams, lotions, and prescription and

---

1. Trudeau's weight loss program claims to be modeled after the "Simeons Protocol," a controversial weight loss program developed by a British physician over fifty years ago. Kevin Trudeau, THE WEIGHT LOSS CURE "THEY" DON'T WANT YOU TO KNOW ABOUT 44–53 (2007). Combining hormonal injections with strict dietary and caloric-intake restrictions, the Protocol claims to redistribute one's body fat and "reset" one's hypothalamus, an area of the brain that controls among other things hunger, thereby reducing the urge to eat. *Id.* at 73–76. The effectiveness of the Simeons Protocol, and particularly the hormone injections, as a weight loss aid has long been disputed. *See* Chorionic Gonadotropin, 39 Fed.Reg. 42,-397–01 (Dec. 5, 1974) (discussing clinical studies).

2. Trudeau argues that Phase One is not mandatory but only "strongly encouraged." He is correct that the book occasionally states that

Phase One is "not required." *E.g.,* WEIGHT LOSS CURE, *supra,* at 74. However, in the book's final chapter, "Putting It All Together: Summary and Conclusions," Trudeau provides a "summary list of check sheets that contain the steps of each phase of the protocol." *Id.* at 211. For all four phases, the check sheets outline the things dieters "MUST" and "MUST NOT" do. The check sheets also outline what is "STRONGLY RECOMMENDED" and "STRONGLY SUGGESTED you NOT do." *Id.* at 213–27. Given that the checklist refers to some items as "recommended" or "suggested," we think it reasonable that dieters would find the items they "must" do as mandatory parts of each phase. This belies the statement earlier in the book that Phase One as "not required." Even if Trudeau subjectively believes Phase One is optional, dieters could reasonably conclude otherwise. The same goes for Phase Four, which Trudeau also argues is optional.

over-the-counter medications. Instead of medications, Trudeau advocates using the "all-natural non-drug alternatives" explained in his *Natural Cures* book.

- **Phase Two,** which requires physician supervision, involves a restricted, all-organic diet of only 500 calories per day, along with daily injections of Human Chorionic Gonadotropin (hCG) hormone.[3] In addition, dieters must drink at least one-half to one gallon of water per day, along with at least four cups of various teas. And it's strongly suggested that dieters do yoga, walk an hour per day, and do resistance training. Dieters must also avoid all skin creams and lotions, MSG, artificial sweeteners, and any prescription or over-the-counter medications.[4] Phase Two lasts between 21 and 45 days.

- **Phase Three,** which lasts 21 days, involves many of the dietary and lifestyle restrictions contained in the earlier phases. Among other things, dieters must drink at least one-half to one gallon of water per day, drink four cups of tea per day, eat six times per day, eat only 100% organic food, walk an hour a day, and get colonics

as recommended by a colon therapist. Dieters must refrain from eating sugars, starches, food cooked in a microwave, and food prepared by fast-food or national chain restaurants. No prescription or over-the-counter drugs either. Dieters are strongly encouraged to avoid exposure to air conditioning and fluorescent lights, and told, "Don't buy heavily advertised products." [5]

- **Phase Four** lasts for the rest of one's life and consists of a list of 50 do's and don'ts. Dieters must eat only 100% organic food, along with a host of vitamins and other supplements. Dieters should avoid artificial sweeteners, food cooked in microwaves, and food sold by fast-food restaurants, national restaurant chains, and publicly traded companies. And again, dieters should not take medications of any kind. Dieters should also continue to avoid air conditioning and fluorescent lights, and must continue to receive colonics and liver, parasite, heavy metal, and colon cleanses.

During all four phases, dieters are instructed that they "MUST" take daily doses of coral calcium.[6]

---

**3.** HCG is a prescription drug often prescribed to stimulate ovulation in infertile women. See http://www.ferringfertility.com/medications/novarel/ (last visited Aug. 24, 2009). It is not approved for weight loss in the United States. 39 Fed.Reg. 42,397–03. To obtain hCG, dieters must either leave the United States or find a doctor who will prescribe hCG "off-label."

HCG should not be confused with hGH (Human Growth Hormone), which has been the subject of countless enhanced substance investigations in amateur and professional sports. A.J. Perez, *HGH detection faces new hurdle: Emerging compounds elude tests, spur hormone production,* USA Today, May 28, 2008, at C1. HCG has not been without its own controversy, however, as major-league slugger Manny Ramirez was recently sus-

pended for 50 games for using the substance. Phil Rogers, Column, *Manny Ramirez Suspended 50 Games: Just Another Baseball Cheat?,* Chicago Tribune, May 8, 2009, at C1.

**4.** How the daily hCG injections square with the prohibition on all prescription drugs is unclear.

**5.** How purchasing the *Weight Loss Cure* book squares with this requirement is also unclear. The FTC maintains that, from December 2006 to December 2007, Trudeau's infomercials for the book aired approximately 32,000 times.

**6.** Trudeau has proven to be quite an effective salesman of the *Weight Loss Cure* book. Despite the rigors of the protocol, the FTC maintains that over 1.6 million copies of the book have been sold.

In the infomercials, Trudeau explains what he believes causes obesity and discusses generally how his weight loss "cure" eliminates that root cause by "resetting" one's hypothalamus and lessening one's urge to eat. He claims that this method has been used for decades by celebrities, royalty, and the ultra-rich, but has been suppressed from the mainstream by food and restaurant companies and government agencies. Trudeau cites a number of success stories, giving examples of how much weight people lost in short amounts of time (e.g., 21 pounds in 14 days).

In the infomercials, Trudeau also claims repeatedly that the *Weight Loss Cure* protocol is "easy," "simple," "very inexpensive," can be completed at home, and is in fact "the easiest [weight loss] method known on planet Earth." However, Trudeau never mentions the hCG injections (though he does mention the need to take a "miracle, magical, all-natural substance"), the 500–calorie per day limitation, the colonics, or any of the other dietary and lifestyle restrictions outlined in the book. Trudeau also claims that, after completing the program, dieters can eat "everything they want, any time they want." As evidence, in one infomercial, Trudeau boasts that the night before the infomercial he had a heaping helping of fatty but delicious foods: "I had . . . real mashed potatoes with cream and butter, gravy loaded with fat . . . a big prime rib marbled with fat . . . [and] a big hot fudge sundae with real ice cream and real hot fudge and real nuts and real whipped cream." But, according to Trudeau, once you've completed the *Weight Loss Cure* program, "you'll keep the weight off forever. You'll never have to diet again."

## C. The Contempt Proceedings

The FTC took issue with Trudeau's infomercials and took him back to court. In September 2007, the FTC sought to hold

Trudeau in contempt for violating the 2004 Consent Order's command that Trudeau "must not misrepresent the content of the book." In the FTC's view, the diet was anything but "easy." Going phase-by-phase, the FTC argued that Trudeau's diet program was in fact incredibly arduous but that, in the infomercials, Trudeau never explained what the program entailed. To the FTC, Trudeau was simply deceiving consumers to sell books. The FTC also argued that Trudeau's claim that "you can eat anything you want" after completing the program was bogus. Phase Four, which lasts forever, requires a far stricter diet.

Trudeau countered that he was merely quoting what he wrote in the book. On a number of pages, *Weight Loss Cure* describes the diet as "easy to do." And the book also states that dieters in Phase Four can eat "anything you want, as much as you want, as often as you want." This approach of quoting phrases from the book, in Trudeau's view, was no different than his *Natural Cures* infomercial, which the FTC apparently approved.

The district court didn't buy it. Even though the book might mention that the diet is "easy," the court concluded that Trudeau's "cherry-picking" a few choice phrases did not accurately portray the book's overall content. And "content" was what the 2004 Consent Order prohibited Trudeau from misrepresenting. The diet was not at all easy, the court observed, and nowhere in his infomercials did Trudeau mention anything like colonics, organ cleanses, eating only organic food, and the 500–calorie–per–day diet in Phase Two. The court also homed in on Trudeau's claim that the program could be completed at home, which the court viewed as impossible given that the diet requires daily injections of a prescription substance not approved for use in diet programs. Tru-

**F.T.C. v. TRUDEAU**        761
Cite as 579 F.3d 754 (7th Cir. 2009)

deau even admitted at a hearing that he received the first three weeks of injections in Germany. Finally, the court took issue with Trudeau's claim that dieters who completed the program could eat "anything you want," like prime rib and hot fudge sundaes; "nothing is restricted," according to the infomercial. But Phase Four, which lasts indefinitely, has 50 restrictions, ranging from eating only organic food to avoiding fast food and food prepared by "national chain restaurants." Because the court found that Trudeau's statements misled consumers and thus violated the Consent Order, the court found Trudeau in contempt.[7] *FTC v. Trudeau,* 567 F.Supp.2d 1016 (N.D.Ill.2007).

**D. The Sanctions**

Trudeau and the FTC then duked it out over remedies. The FTC requested reimbursement for all consumers who purchased the book, via the infomercial or in stores, totaling over $46 million (of that, approximately $37 million came from infomercial sales and about $9 million from retail). Alternatively, the FTC argued that at least Trudeau should disgorge his profits, which the FTC estimated to be around $12 million (over $6 million from infomercial sales, over $5 million from retail sales, and around $250,000 in salary). (R. 186.) In addition, the FTC moved to

modify the 2004 Consent Order to ratchet up the injunction's deterrent effects. Primarily, the FTC sought to require Trudeau to post a $10 million performance bond before participating in book-related infomercials. (R. 187.)

Trudeau disputed all of this. He argued that consumers suffered no harm from his infomercials, and even if they had, he should not be punished beyond what money he received for participating in the infomercials. Conveniently, Trudeau claimed he received nothing for appearing in the infomercials; he had already sold his rights to ITV and agreed to seek no additional compensation. He only received royalties from the retail sales. But those, he argued, could not be tied to the infomercials (despite the big, gold sticker on the cover of the book which reads, "AS SEEN ON TV"). In the end, Trudeau contended that he should be held responsible for only a fraction of total revenues, if any at all; and that, should the court impose a stiffer sanction, he was without the financial means to satisfy it. (R. 117.) Trudeau also challenged the FTC's motion to modify the Consent Order, calling the $10 million bond requirement excessive and punitive. (R. 122.)

The district court was troubled by the FTC's calculations and found the $46 million figure "rather Draconian." (Tr. 355,

---

7. Trudeau moved to reconsider the contempt finding, arguing among other things that FTC policy prohibited it from initiating enforcement proceedings against him. The FTC's so-called "Mirror Image Doctrine" states that the FTC, "as a matter of policy, ordinarily will not proceed against advertising that promotes the sale of books and other publications: *Provided,* The advertising only purports to express the opinion of the author or to quote the contents of the publication. . . ." Advertising in Books, 36 Fed.Reg. 13414–02 (July 21, 1971) (emphasis in original). Trudeau argued that he merely gave his opinion and quoted his book in the *Weight Loss Cure* infomercial. The court disagreed for several

reasons. First, the 2004 Consent Order never contemplated this Doctrine. Second, the Doctrine merely states a general policy approach—"*ordinarily,*" the FTC will refrain from proceeding against ads for books. Even if the Doctrine applied to this case, the court observed, it would be unsurprising if the FTC made an exception for Trudeau, "who has a long history of consumer deception as well as findings of contempt by this court." *FTC v. Trudeau,* 572 F.Supp.2d 919, 922 (N.D.Ill. 2008). The court then reiterated its conclusions that Trudeau's claims in the *Weight Loss Cure* infomercial misled consumers and violated the 2004 Consent Order. *Id.* at 922–24.

July 25, 2008.) But the court also found Trudeau's arguments incredible and the evidence of his financial condition "not worth the paper it is written on." *FTC v. Trudeau*, 572 F.Supp.2d 919, 925 (N.D.Ill. 2008). So, with respect to the monetary sanction, the court required Trudeau to pay the FTC a little over $5.1 million to disgorge some of the royalties he received from sales of the *Weight Loss Cure* book. *Id.* at 925–26 & n. 8. Also in its order on contempt remedies, the court concluded that, given Trudeau's prior willingness to flout court orders, only a complete ban on infomercials for three years would achieve compliance and protect consumers.[8]  *Id.* at 925–26.

A few months later, the court revisited these sanctions as a result of the FTC's Rule 59(e) motion to correct a mathematical error. The FTC argued that the court slightly undercounted the royalties Trudeau received and requested an increase of a couple hundred thousand dollars. (R. 165, 166.) The court, however, upped its monetary award to $37.6 million, "representing a reasonable approximation of the loss consumers suffered as a result of defendant's deceptive infomercials." The

court also reiterated its three-year infomercial ban. Supp. Order & J., *FTC v. Trudeau*, No. 03–CV–3904 (N.D.Ill. Nov. 4, 2008) (R. 220.) After the court denied Trudeau's motions to amend and alternatively stay the judgment, Trudeau appealed, challenging every aspect of the district court's decision—the contempt finding, the $37.6 million sanction, and the infomercial ban. We address each in turn.

## II. The Contempt Finding

[1, 2] Trudeau argues that he should not have been held in contempt of the 2004 Consent Order. We review the district court's contempt finding for abuse of discretion and "will not reverse 'unless the result was clearly erroneous or unless we find an abuse of discretion by the district court.'" *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir.2007) (quoting *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir. 1993)), *cert. denied*, — U.S. ——, 128 S.Ct. 1451, 170 L.Ed.2d 276 (2008); *see also United States v. Silva*, 140 F.3d 1098, 1101 n. 4 (7th Cir.1998) ("It suffices to articulate the abuse of discretion standard as the general standard of review in this

---

8. The relevant text of the three-year infomercial ban reads:

> For a period of three (3) years from the date of entry of this Supplemental Order and Judgment, Kevin Trudeau, directly or through any . . . entity under his direct or indirect control, and . . . all persons and entities in active concert or participating with Trudeau . . . , are hereby enjoined and restrained from disseminating, or assisting others in disseminating, any infomercial for publication in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any book, newsletter, or other informational publication in any format, in or affecting commerce, in which Trudeau has any interest.
>
> "Infomercial" means any written or verbal statement, illustration or depiction that is 120 seconds or longer in duration that is

> designed to effect a sale or create an interest in the purchasing of goods or services, which appears in radio, television (including network and cable television), video news release, or the Internet.
>
> "Interest" means any direct or indirect monetary, financial, or other material benefit, including but not limited to royalty payments on the sale of any . . . publication . . . endorsed by Trudeau, or any benefit received in exchange for partial or full ownership of, or rights to, any . . . publication . . . written or created by him, but excluding payments made to Trudeau solely in exchange for his appearance as a spokesman for a book . . . in which he does not have an interest. Trudeau is presumed to have an ongoing interest in any . . . publication . . . written or created by him unless conclusive evidence establishes otherwise.

area. The district court abuses its discretion when it makes an error of law or when it makes a clearly erroneous finding.").[9]

**[3, 4]** To succeed on a contempt petition, the FTC must "demonstrate by clear and convincing evidence that the respondent has violated the express and unequivocal command of a court order." *Autotech*, 499 F.3d at 751 (emphasis omitted); *see also Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 591 (7th Cir.2008); *Goluba*, 45 F.3d at 1037. Restated in terms of elements, the FTC must show that

> (1) the Order sets forth an unambiguous command; (2) [Trudeau] violated that command; (3) [Trudeau's] violation was significant, meaning it did not substantially comply with the Order; and (4) [Trudeau] failed to take steps to reasonable [sic] and diligently comply with the Order.

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008); *see also Goluba*, 45 F.3d at 1037 ("The district court does not, however, ordinarily have to find that the violation was 'willful' and may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered." (internal quotations omitted)).

At the heart of this case is the court's command in its 2004 Consent Order that "the infomercial for any such book . . . must not misrepresent the content of the book."

## A.

Trudeau raises several arguments challenging the court's contempt finding; they focus principally on the second and fourth elements. Regarding the second element, Trudeau argues that his infomercials didn't

---

**9.** Though not argued by either party, there is some authority that the appropriate standard of review in this case given the consent order is de novo. See *Bailey v. Roob*, 567 F.3d 930, 940 (7th Cir.2009) ("A court interprets the meaning of a consent decree in the same way it interprets the meaning of a contract, and a reviewing court examines that interpretation de novo."); *Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 908–09 (7th Cir.1995) (consent decree is a form of contract over which appellate court has plenary power to review); *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037–38 (7th Cir.1995) ("Because a consent decree is a form of contract, we typically review the district court's interpretation of the consent decree as we would its interpretation of a contract: *de novo.*"). *But see Autotech*, 499 F.3d at 751 (applying an abuse of discretion standard for district court's interpretation of an "Agreed Order").

Nonetheless, we have also held that, even in the consent-decree context, district court interpretations are entitled to deference where the district court has overseen the consent decree for a significant period of time. In such cases, we have held that abuse of discretion or some similar deferential standard ap-

plies. See *South v. Rowe*, 759 F.2d 610, 613 n. 4 (7th Cir.1985) ("The appellate court must give some deference, however, to the district judge's views on interpretation where the judge oversaw and approved the decree. [citation omitted.] Indeed, where the district judge has overseen the litigation generated by the decree and the underlying dispute for an extensive period of time, his interpretation of the decree will be reversed only for an abuse of discretion."); *see also Goluba*, 45 F.3d at 1038 & n. 5 ("Where, as in the present case, the district court oversaw and approved the consent decree, we will nonetheless give some deference to the court's interpretation. . . . [Abuse of discretion] is applicable where, as in *Ferrell [v. Pierce*, 743 F.2d 454, 461 (7th Cir.1984) ], the judge oversaw the consent decree for an extended period of time and the decree is particularly complex or intricate."). The district court has overseen the Consent Order for nearly five years and has overseen Trudeau's conduct for over ten. Given that history, the district court's conclusions deserve a degree of deference. Whether such deference is equivalent to an abuse-of-discretion standard is immaterial, though, because our conclusion would not change even with a less deferential standard.

misrepresent anything and thus didn't violate the Consent Order. In Trudeau's view, describing the protocol as "easy" and saying dieters who complete the protocol can eat "anything you want" merely quoted or paraphrased the book.

We aren't persuaded. Trudeau agreed not to "misrepresent the *content* of the book." We concur with the district court that "the word 'content' does not refer to a few cherry-picked phrases." *Trudeau*, 567 F.Supp.2d at 1022. The 2004 Consent Order had two purposes: to protect consumers from deceptive practices and to compensate those already allegedly deceived. (R. 56.) The Order wouldn't go very far in accomplishing that first goal if it merely prohibited misquoting the book, as Trudeau suggests. In the consumer protection context, the word "content" refers to the substance of a publication, its "essential meaning" or the "topics" and "ideas" contained within. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 492 (1986). When people buy books, they purchase the author's ideas, as expressed through an amalgamation of many individual statements. They don't purchase select quotes (unless it's a book of quotes). So it's possible to accurately recount specific statements in isolation but still completely misrepresent the "content" of the book by allowing consumers to infer that the quotations are indicative of the content, when in fact they are not.

That's precisely what Trudeau did when he described the protocol as "easy" and "inexpensive," said that dieters can "do it at home," and boasted that after completion a dieter can eat "anything you want" with "no restrictions." No one disputes that Trudeau's book repeatedly states that the protocol is "easy." But the principal content of the book is the diet protocol itself, along with how it works, why it was suppressed, and how successful it is. Like the district court, we think the protocol is anything but easy, simple, or able to be done at home. Phase One alone contains 60 separate rules for dieters to follow, three dozen of which the book says a dieter "MUST" or "MUST NOT" do. But in the infomercials, Trudeau fails to mention a single aspect of his weight loss protocol. He never talks about the 500–calorie–per–day limitation, the colonics (or water enemas), the organ cleanses, the 100% organic diet (which the book even acknowledges is "next to impossible"), or any of the other dietary or lifestyle restrictions that the book says dieters "must" adhere to.[10] The closest he comes to letting viewers know what is actually involved with the diet is to say that dieters must take a "miracle, magical, all-natural substance" that will reset their hypothalamus and reduce their hunger. But Trudeau leaves out the fact that the magical substance is actually a prescription drug taken by injection that cannot be prescribed for weight loss in the United States and can cause several serious adverse reactions.[11] So dieters are left

10. Trudeau does say in his infomercials that physical exercise is recommended. But he also repeatedly says that exercise is not required and that one can achieve the weight loss results without exercise. However, according to the *Weight Loss Cure* book, walking outside for an hour a day is something that dieters "MUST" do during Phases One, Three, and Four, and something that is "STRONGLY SUGGESTED" in Phase Two. One might wonder how a person can walk for an hour each day when consuming only 500 calories.

11. The label for Novarel, a brand name for hCG, states:

> **INDICATIONS AND USAGE:** HCG HAS NOT BEEN DEMONSTRATED TO BE EFFECTIVE ADJUNCTIVE THERAPY IN THE TREATMENT OF OBESITY. THERE IS NO SUBSTANTIAL EVIDENCE THAT IT INCREASES WEIGHT LOSS BEYOND THAT RESULTING FROM CALORIC RESTRICTION, THAT IT CAUSES A MORE ATTRACTIVE OR "NORMAL" DISTRIBUTION OF FAT, OR THAT IT DECREASES THE HUNGER AND DISCOMFORT ASSO-

**F.T.C. v. TRUDEAU**      **765**
Cite as 579 F.3d 754 (7th Cir. 2009)

with either convincing their doctor to prescribe hCG off-label or traveling to a foreign country, as Trudeau did, to get the drug. But only after the infomercial viewer spends the money to buy the book does he or she learn any of this.

Trudeau counters that his calling the protocol "easy" merely describes his subjective opinion; in his view, the FTC shouldn't be able to call him a liar for simply speaking his mind. In many circumstances, using such subjective, comparative terms as "easy" constitutes mere "puffing," an exaggerated opinion expressed for the intent to sell something. BLACK'S LAW DICTIONARY 1269 (8th ed.2004); *see also Corley v. Rosewood Care Ctr., Inc.,* 388 F.3d 990, 1008–09 (7th Cir.2004) (claim that service was "high quality" was mere puffery). In *Carlay Co. v. FTC,* 153 F.2d 493 (7th Cir.1946), for example, the FTC sought to stop a company from advertising its weight-loss plan as "easy" and without dietary restrictions. The plan involved eating a few pieces of caramel candy before meals to decrease hunger. *Id.* at 494. After examining what the diet required, we set aside the FTC's cease-and-desist order because we concluded the advertisements were harmless puffery and not deceptive. *Id.* at 496 ("This, comparatively speaking when one thinks of reduction of obesity, anyone must declare comparatively simple, comparatively easy."). Trudeau argues that his infomercials are no different from the advertising in *Carlay,* espousing subjective opinions incapable of misleading consumers.

Trudeau misreads *Carlay. Carlay* does not stand for the proposition, as Trudeau suggests, that bragging about the relative ease of a product is always puffery *per se.*

Puffery is ordinarily defined as "empty superlatives on which no reasonable person would rely. . . ." *All–Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 868 (7th Cir.1999); *see also Speakers of Sport, Inc. v. ProServ, Inc.,* 178 F.3d 862, 866 (7th Cir.1999). Given the large number of weight loss programs on the market, we think a reasonable person would rely on statements about the relative ease of the program being marketed. Therefore, in *Carlay,* we examined what the diet actually required and then determined, under those circumstances, that the advertised claim that the diet was easy was not misleading. *Carlay,* 153 F.2d at 496 ("[W]e think the only inference possible to draw from the undisputed facts lead necessarily to the conclusion that the plan is not a complicated one, but rather a relatively easy one involving no drugs, no restricted or rigorous diet. . . ."). But subjective, comparative terms are not always purely innocuous; courts, including the Supreme Court, have found that such terms are capable of deceiving consumers. *See Reilly v. Pinkus,* 338 U.S. 269, 271–75, 70 S.Ct. 110, 94 L.Ed. 63 (1949) (finding that weight loss program advertising could support finding of fraud when it claimed that dieters could "eat plenty" and reduce their weight "surely and easily, 'without tortuous diet,'" when in fact there was little evidence that diet had any weight-loss benefits and the diet could not be "pursued in ease and comfort"); *Goodman v. FTC,* 244 F.2d 584, 603 (9th Cir.1957) (finding that, under the circumstances, seller's representations about the "ease" of learning how to weave from seller's products were deceptive). Such is the case here. The *Weight Loss Cure* protocol—which does involve

---

CIATED WITH CALORIE–RESTRICTED DIETS.
See http://www.ferringfe rtility.com/medications/novarel/novarelpi.pdf (last visited Aug. 24, 2009).

The principal serious adverse reactions are ovarian enlargement, enlargement or rupture of preexisting ovarian cysts, multiple births, and arterial thromboembolism. *Id.*

drugs and a restricted and rigorous diet—is hardly "easy" when compared to the diet examined in *Carlay* or any number of other diet programs that do not involve the combination of daily injections, heavily restricted diets, colonics, organ cleanses, and daily exercise, among dozens of other restrictions.

Furthermore, Trudeau's puffery argument misses the point of the court's do-not-deceive order. The order applies to more than singular statements in the infomercials—the order regulates the infomercials themselves. To determine whether Trudeau violated the Order, we look not to isolated claims of relative ease but to what the infomercial as a whole conveyed. *Cf. Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir.2009) ("In determining whether a statement is puffery, the context matters.").

Through a repetitive mosaic of vague, glowing statements, Trudeau creates an image of a safe, simple, inexpensive way to shed pounds without exercise or dietary restrictions. But, as we discussed, that's hardly the regimen the book describes. In the infomercials, Trudeau never mentions the hCG injections but instead talks about a "miracle all-natural substance" that is "easy to get" (in fact, he claims "you can get it anywhere"), and which he claims is the "[s]afest, most effective way to lose weight on Planet Earth." Beyond the fact that hCG is a prescription medication unable to be prescribed for weight loss (so dieters can hardly pick it up at any corner store, as viewers are led to believe), we find Trudeau's claim about the safety of the "miracle substance" particularly troubling given the potentially devastating side effects associated with taking hCG, *see* note 11, *supra*. Furthermore, Trudeau reinforces his "easy to do" with comments like, "[T]his substance, combined with a few other little things in the protocol, triggers the hypothalamus gland." The 500–calorie–a–day diet in Phase Two and the dozens of diet and lifestyle restrictions are hardly "a few other little things." These kinds of statements, combined with Trudeau's repeated claims that the diet is "easy," misrepresent the content of the book.

Moreover, even if we assume that part of Trudeau's pitch was mere puffery, the infomercials are still loaded with other statements that are patently false. Trudeau repeatedly claimed in the infomercials that the protocol can be completed "at home" and that "you don't have to go to a clinic to do it." But the book instructs that all hCG injections must be administered under a physician's supervision and that trips to a licensed colon therapist for colonics are required. Even if dieters administer their own hCG injections, at least some visits to the doctor's office are necessary. As the district court noted, house calls are exceedingly rare these days and would likely be cost-prohibitive, which would contradict Trudeau's claim that the diet is "inexpensive."

Trudeau's claim that upon completion of the protocol dieters can eat anything they want—that "nothing is restricted"—is equally erroneous and deceiving. Trudeau is correct that the book echoes this statement: "eat anything you want, as much as you want, as often as you want." But in the very next sentence, which Trudeau never mentions in the infomercials, the book reads: "The only caveat is only eat 100% organic food." WEIGHT LOSS CURE, *supra*, at 106. The book then goes on to list dozens of "dos and don'ts" that prescribe precisely what to eat, what not to eat, when to eat, and how much to eat. No food produced by publicly traded companies. No fast food or food served in regional or national chain restaurants. No corn syrup. No artificial sweeteners. No trans fats. No MSG. No food prepared in

**F.T.C. v. TRUDEAU**
Cite as 579 F.3d 754 (7th Cir. 2009)

767

a microwave. No farm-raised fish. These are dietary restrictions; dieters cannot eat anything they want.

In sum, Trudeau misrepresented the content of his *Weight Loss Cure* book. Trudeau may have quoted parts of his book, but he did so deceptively. These selective quotations mislead because they present consumers with an incomplete picture of what the protocol requires, thereby inducing consumers to purchase the book on false hopes and assumptions. True, Trudeau's belief that the protocol is "easy" is his subjective opinion. But without giving consumers a fuller picture of what the protocol entails while claiming that the protocol is "the easiest method known on planet Earth," consumers are led to believe that Trudeau's statements are more than just his beliefs; they appear as objective facts. Moreover, Trudeau did more than just quote his book; he outright lied. In one infomercial, Trudeau claimed the protocol was "not a diet, not an exercise program, not portion control, not calorie counting, . . . no crazy potions, powder or pills . . . ." None of that is true. Dieters "MUST" eat only 100% organic food, walk an hour a day, eat six meals per day, eat only 500 calories per day for up to 45 days, drink organic raw apple vinegar cider, and take probiotics, krill oil, Vitamin E, digestive enzymes, and Acetyl–L Carnitine. Consequently, we conclude Trudeau violated the 2004 Consent Order by misrepresenting the content of his book.[12]

**B.**

Turning to the fourth element of the standard for contempt, Trudeau contends that he diligently tried to adhere to the court's command. He submits that the *Weight Loss Cure* infomercial was no different from his previous *Natural Cures* infomercials, which the FTC implicitly blessed by not objecting to them. Moreover, Trudeau claims he had been in fairly regular contact with the FTC after the court issued the 2004 Consent Order. He complains that the FTC never gave him a heads-up that his *Weight Loss Cure* infomercial was problematic until it filed its contempt complaint, though it had first seen the infomercial eight months before filing.

None of this convinces us that we should reverse. First, that the FTC did not object to the *Natural Cures* infomercial is largely irrelevant. Estoppel against the government is available only under narrow circumstances. *See United States v. Lindberg Corp.,* 882 F.2d 1158, 1164 (7th Cir. 1989). Trudeau's are not among them. Nothing about the FTC's prior approval should have led Trudeau to believe that he could selectively quote his weight loss book as being "easy" and "simple," while leaving out nearly every relevant detail about the weight loss protocol. Moreover, as we just discussed, Trudeau didn't merely "quote" the weight loss book. He falsely described the weight loss protocol to make it sound safer and less arduous than it actually is.

**12.** Given Trudeau's blatant misrepresentations, we cannot accept Trudeau's argument that the FTC's enforcement proceedings violate the FTC's own policy, the Mirror Image Doctrine, which says that the FTC will ordinarily stay its hand if an ad for a book merely quotes the book or expresses the author's opinion. Advertising in Books, 36 Fed.Reg. 13414–02 (July 21, 1971). Trudeau did not merely quote his book or express his opinions. He made factual assertions that directly contradict what he wrote in the book. The Mir-

ror Image Doctrine was adopted to help the FTC avoid running afoul of the First Amendment when regulating advertising for publications. But, under the First Amendment, "false or misleading commercial speech receives no protection at all." *United States v. Benson,* 561 F.3d 718, 725 (7th Cir.2009) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). So we see no constitutional problem with the finding of contempt in this case.

The extent to which Trudeau could reasonably rely on the FTC's approval of the *Natural Cures* infomercial ended when Trudeau began uttering false statements and quotes that mischaracterized the content of the *Weight Loss Cures* book.

Trudeau's focus on the 8–month delay between the time the infomercials first hit the airwaves and the date the FTC filed its contempt petition is equally unavailing. Though the FTC knew the infomercials were on the air by January 2007, they didn't receive a copy of the *Weight Loss Cure* book until March. This could have been because the book was not yet published when the infomercials first started running. By July of that year, the FTC's division of enforcement concluded its review of the matter and recommended that contempt proceedings were necessary. That recommendation moved through the FTC's bureaucracy over the next two months, and on September 10, the Commission authorized the Division of Enforcement to file a civil contempt action against Trudeau. We cannot say that any delay associated with this seemingly ordinary review process was "prolonged and inexcusable" such that it would support Trudeau's laches-like argument.[13] *See id.* at 1164 ("Regarding the application of laches against the government, this court has stated that '[l]aches bars the assertion of a claim where deferment of action to enforce claimed rights is prolonged and inexcusable and operates to . . . [a party's] material prejudice.' " (quoting *Woodstock/Kenosha Health Ctr. v. Schweiker*, 713 F.2d 285, 291 (7th Cir.1983))).

We see nothing that would justify overturning the district court's conclusions. Trudeau did not diligently comply with the Consent Order at all. Beyond the fact that Trudeau repeatedly distorted the content of the *Weight Loss Cure* book in multiple infomercials, we have insufficient indication in the record, despite Trudeau's assertions to the contrary, that Trudeau was regularly in contact with the FTC regarding the *Weight Loss Cure* infomercial. Trudeau complains about the FTC not starting its review of the infomercial sooner. But we see no evidence that Trudeau provided the FTC with an unpublished manuscript or some other means to speed up the review process. And we have nothing to indicate that either Trudeau or ITV ceased airing the infomercial upon the FTC's filing for contempt. In short, we see no reason to conclude that Trudeau diligently complied with the Consent Order's command not to misrepresent the content of his books. Accordingly, the district court did not err in finding Trudeau in contempt.

### III.   The Monetary Sanction

Though the district court was right in finding Trudeau in contempt, the monetary sanction imposed to remedy that contempt is a different story. We review the sanction amount for clear error, but we review the calculation method used to reach that amount de novo. *FTC v. Kuykendall*, 371 F.3d 745, 763 (10th Cir.2004) (en banc). Ultimately, the final $37.6 million figure the district court settled on might be correct. But the court's order, as it stands now, does not give us enough information to affirm that conclusion. The order tells us little about such things as how the court arrived at the figure it did, whether the award will be used to reimburse consumers, and what happens if there's money left over after all reimbursements are paid. So we must remand to allow the court to

---

**13.**   For these reasons, Trudeau's one-sentence attempt at a laches argument in the remedy portion of his brief also fails. Trudeau cannot show "an unreasonable lack of diligence by the party against whom the defense is asserted" or "prejudice arising therefrom." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir.1999).

provide greater detail on these questions. Beyond more detail in the order, Trudeau seeks greater procedural protections, such as a jury trial and a proof-beyond-a-reasonable-doubt standard, on remand. We decline to find such safeguards required in this case.

### A.

**[5, 6]** Contempt sanctions come in two forms—criminal and civil. In a given case, which form a sanction takes depends on the "character of the relief itself," and not on the "subjective intent of . . . courts." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *see also Shillitani v. United States*, 384 U.S. 364, 369, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) (" 'It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish' civil from criminal contempt.") (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911)). The form of the sanction matters because criminal sanctions require certain constitutional safeguards before they are imposed (e.g., right to counsel, notice of charges, double jeopardy, proof beyond a reasonable doubt). *Bagwell*, 512 U.S. at 826–27, 831, 114 S.Ct. 2552; *In re Troutt*, 460 F.3d 887, 893 (7th Cir.2006); *see also* FED.R.CRIM.P. 42(a). Civil sanctions, by contrast, may be imposed without as many safeguards, *Bagwell*, 512 U.S. at 831, 114 S.Ct. 2552, though some level of due process is always required, and might vary depending on the circumstances, *id.* at 833–34, 114 S.Ct. 2552 ("Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding."); *see generally* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2960 (2d ed.2009).

It's undisputed that Trudeau's contempt proceedings had none of the bells and whistles of a criminal trial. *See* FED. R.CRIM.P. 42(a) (requiring, in most circumstances, elaborate notice, appointment of a prosecutor, and a jury trial). And the government has not yet sought criminal punishment. So for the $37.6 million judgment to stand, we must conclude that the sanction was a "civil" one.

**[7, 8]** The differences between criminal and civil contempt sanctions are not always easy to discern. *See Bagwell*, 512 U.S. at 827, 114 S.Ct. 2552. Generally, civil contempt "is remedial, and for the benefit of the complainant," while criminal contempt "is punitive, to vindicate the authority of the court." *Id.* at 827–28, 114 S.Ct. 2552; *Manez*, 533 F.3d at 590. In terms of monetary sanctions, civil sanctions fall in two categories. They can *compensate* the complainant for his losses caused by the contemptuous conduct. *Bagwell*, 512 U.S. at 829, 114 S.Ct. 2552; *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Or they can *coerce* the contemnor's compliance with a court order. A coercive sanction must afford the contemnor the opportunity to "purge," *Bagwell*, 512 U.S. at 829, 114 S.Ct. 2552, meaning the contemnor can avoid punishment by complying with the court order, *Penfield Co. v. SEC*, 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947). On the other hand, a criminal contempt sanction is "a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt . . . [where] the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Bagwell*, 512 U.S. at 829, 114 S.Ct. 2552.

**[9]** Trudeau argues that the sanction imposed was neither coercive nor compensatory and thus not civil. We think Trudeau is clearly right on the coercive part. The district court described its sanction as "coercive," in the sense that it would "con-

vince somebody like Kevin Trudeau to not disobey the orders of the Court." But that's not quite what the Supreme Court intended coercive contempt sanctions to be. "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id.* Trudeau must be able to avoid the penalty, or some part of it, by complying with the order. If Trudeau were incarcerated for his contempt, we would say he "carries the keys of his prison in his own pocket." *Gompers*, 221 U.S. at 442, 31 S.Ct. 492 (quotation omitted). This is because coercive sanctions are "not intended as a deterrent to offenses against the public." *Penfield*, 330 U.S. at 590, 67 S.Ct. 918; *see also In re Grand Jury Proceedings*, 280 F.3d 1103, 1107 (7th Cir.2002) ("A contempt order is considered ... criminal if its purpose is to punish the contemnor, vindicate the court's authority, or deter future misconduct."). As the order stands now, Trudeau has no opportunity to purge any of the $37.6 million judgment by representing his books truthfully from here on out. Without a purge provision, the order is not coercive.

So for the sanction to stand, it must "compensate the complainant for losses sustained." *United Mine Workers*, 330 U.S. at 303–04, 67 S.Ct. 677. The FTC explicitly sought a compensatory remedy. (R. 186.) And the district court stated at the hearings on remedies and, to some extent, in its order that it intended to compensate those who bought the *Weight Loss Cure* book as a result of the infomercial. But, as we mentioned, the court's subjective intent is largely irrelevant; what counts are the characteristics of the sanction actually imposed. *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552; *Shillitani*, 384 U.S. at 369, 86 S.Ct. 1531.

For the most part, we agree with Trudeau that the characteristics that make a contempt sanction compensatory are missing from the $37.6 million order. The court's order lacks two key ingredients needed in any compensatory contempt sanction: (1) the order fails to explain how the court arrived at the $37.6 million figure; and (2) the order lacks any mention of how the sanction should be administered. *See Kuykendall*, 371 F.3d at 763–67. Though we can't promise a "cure" from reversal, we endeavor in the following discussion to provide some general guidelines for imposing a compensatory contempt sanction in this case.

**1.**

The district court must explain how it arrived at the specific amount of the sanction imposed. *Mid–Am. Waste Sys., Inc. v. City of Gary, Ind.*, 49 F.3d 286, 293 (7th Cir.1995) ("A judge reckoning a compensatory award must make subsidiary findings that permit the parties (and the court of appeals) to know the basis of the decision."); *see also Autotech*, 499 F.3d at 752 ("The amount of the sanction must be supported in the record."). This means not only explaining where the numbers came from, but also outlining the methodology the court used to crunch those numbers and arrive at what it believed to be the appropriate amount. *See Mid–Am. Waste Sys.*, 49 F.3d at 293; *SEC v. McNamee*, 481 F.3d 451, 457 (7th Cir.2007); *Kuykendall*, 371 F.3d at 763–64. This information is crucial to ensuring that the award is not greater than necessary. If any part of it winds up being punitive instead of remedial, then criminal proceedings are required to sustain it. *Nye v. United States*, 313 U.S. 33, 43–44, 61 S.Ct. 810, 85 L.Ed. 1172 (1941); *see also Bagwell*, 512 U.S. at 831, 114 S.Ct. 2552.

We agree with Trudeau that the district court's contempt sanction was deficient in this regard. The court's order gives little indication of how the court arrived at the

award it did. Perhaps more importantly, we're left clueless as to how or why the award ballooned from around $5 million in the original order to over $37 million in response to the FTC's Rule 59 motion, which never requested such an increase (the FTC's motion merely endeavored to correct a "mathematical error" and increase the award by a couple hundred thousand dollars). All we have is a statement that the $37,616,161 figure "represent[s] a reasonable approximation of the loss consumers suffered as a result of defendant's deceptive infomercials." Supp. Order & J., *FTC v. Trudeau*, No. 03–CV–3904 (N.D.Ill. Nov. 4, 2008) (R. 220). What kinds of "loss" does that figure approximate? Does it include all book sales, or only sales made through the 800–number provided in the infomercials (and not retail book sales)? What about Internet sales? Does the figure include shipping and handling fees? What about returns—does it net those out against the book sales? *See Autotech*, 499 F.3d at 752 ("When the purpose of sanctions in a civil contempt proceeding is compensatory, a fine, payable to the complainant, must be based on evidence of actual loss." (quoting *S. Suburban Housing Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir.1999))). And why did the court switch its basis for the award from disgorging a portion of Trudeau's royalties (the original $5.1 million judgment) to fully compensating consumer losses? Though we can guess where the $37,616,161 figure comes from (that's the amount the FTC in its original remedies brief argued was attributable to book sales from infomercials less returned books), the order contains hardly any findings to substantiate it. In other words, the district court failed to sufficiently "calibrate the fines to damages caused by [Trudeau's] contumacious activities." *Bagwell*, 512 U.S. at 834, 114 S.Ct. 2552. On remand, the district court should make sufficient factual findings to substantiate its award

amount. *Mid–Am. Waste Sys.*, 49 F.3d at 293. This means the court must explain the method it used to calculate the award, why the court chose that method, and how the evidence of record supports the figures plugged into that method.

Trudeau asks us to go further and tell the district court which calculation method it should use. Relying on the Second Circuit's opinion in *FTC v. Verity Int'l Ltd.*, 443 F.3d 48, 66–70 (2d Cir.2006), Trudeau contends that the district court should base its award not on consumers' losses but rather on Trudeau's gain, a sum he argues is only a fraction, if anything, of what book purchasers lost.

[10] We decline Trudeau's invitation to be so exacting at this stage in the proceedings. Courts have broad discretion to fashion contempt remedies and the particular remedy chosen should be "based on the nature of the harm and the probable effect of alternative sanctions." *Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir.1988). Consumer loss is a common measure for civil sanctions in contempt proceedings and direct FTC actions. *See, e.g., FTC v. Febre*, 128 F.3d 530, 536 (7th Cir.1997) (direct FTC action under FTC Act § 13(b)); *Kuykendall*, 371 F.3d at 764–66 (contempt proceeding); *McGregor v. Chierico*, 206 F.3d 1378, 1388–89 (11th Cir.2000) (direct FTC action under FTC Act § 13(b)); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606–07 (9th Cir.1993) (direct FTC action under FTC Act § 19). Indeed, some courts, including ours, have held that in certain cases consumer loss is a more appropriate measure than ill-gotten gains. *See FTC v. Stefanchik*, 559 F.3d 924, 932 (9th Cir.2009); *Febre*, 128 F.3d at 536; *Figgie*, 994 F.2d at 606–07. Nonetheless, we have held, in both contempt proceedings and direct FTC actions, that the defendant's profits can be a proper measure for sanctions. *See Connolly*, 851

F.2d at 933–34 (holding that *United Mine Workers*, 330 U.S. at 304, 67 S.Ct. 677, which stated "such [compensatory] fine[s] must of course be based upon evidence of complainant's actual loss," did not limit contempt sanctions to only consumer loss); *FTC v. QT, Inc.*, 512 F.3d 858, 863 (7th Cir.2008) ("Disgorging profits is an appropriate remedy" in direct FTC action); *cf. Leman v. Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 456–57, 52 S.Ct. 238, 76 L.Ed. 389 (1932) ("Profits are thus allowed as an equitable measure of compensation" in patent infringement cases). In fact, some courts have imposed hybrid awards that include some combination of ill-gotten gains and consumer losses. *See QT*, 512 F.3d at 864; *Figgie*, 994 F.2d at 601, 607–08. So, in the abstract, more than one measure could be reasonable; the circumstances of the case will dictate which is most appropriate. For example, as a prerequisite to basing sanctions on consumer loss, courts often require a finding that the defendants were "engaged in a pattern or practice of contemptuous conduct" as opposed to "isolated instances of contumacy." *Kuykendall*, 371 F.3d at 764; *see also Figgie*, 994 F.2d at 606 (allowing consumer loss as measure of sanction where defendant's misrepresentations were "widely disseminated"); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir.1991) (same). Here, however, the district court's order gives no indication why consumer loss is the better remedy.

Likewise, the court's order contains no factual findings that would justify our mandating that the court adopt the Second Circuit's approach in *Verity* on remand. The court in *Verity*, which dealt with a direct FTC action, held that certain circumstances require courts to limit disgorgement to the defendant's profits. The court explained that, at bottom, the equitable remedy available under § 13(b) of the FTC Act is restitution, which is properly measured as "the benefit unjustly received by the defendants." *Verity*, 443 F.3d at 67. The court observed that the amount of that benefit would often equal the amount consumers lost. So consumer loss would often be an appropriate measure for restitution. However, in some situations— "for example, when some middleman not party to the lawsuit takes some of the consumer's money before it reaches the defendant's hands"—the amount the defendants unjustly received might equal only a fraction of total consumer loss; in those cases, the Second Circuit held that restitution must be limited to that fraction, as opposed to total loss. *Id.* at 68.

Trudeau likens his case to *Verity*, claiming that ITV operated as a "middleman" who skimmed the revenue from the book sales before Trudeau could pocket any of it. But we lack any factual finding from the district court to that effect. In an earlier order, the district court noted that one of Trudeau's companies sold its assets to ITV in exchange for monthly payments of $1 million for 121 months. But the court also noted that Trudeau had taken no steps to enforce his contractual rights. As such, we are somewhat dubious as to whether ITV is completely unaffiliated with Trudeau, as Trudeau claims, and thus whether it could be an independent "middleman" at all. But that is beside the point. Considering whether *Verity*'s reasoning applies here would be premature absent a finding that ITV indeed operated as a middleman. We will leave the first crack at the factual and legal questions posed by Trudeau's *Verity* argument to the district court.

So in sum, we reiterate that the district court has broad discretion to fashion an appropriate remedy in a civil contempt action. *Connolly*, 851 F.2d at 933. Ultimately, the court's $37.6 million award might be reasonable. But so might a lesser figure based only on Trudeau's profits.

Whether the court chooses consumer losses or ill-gotten gains, though, the court must explain why it chose the calculation method it did and how the record supports its calculations. The FTC bears the initial burden of establishing the baseline figure: a reasonable approximation of losses, gains, or some other measure the court finds appropriate. *See Kuykendall*, 371 F.3d at 764; *Febre*, 128 F.3d at 535. "[T]hen the burden shifts to the defendant[] to show that those figures were inaccurate." *Febre*, 128 F.3d at 535; *see also QT*, 512 F.3d at 864; *Kuykendall*, 371 F.3d at 766 ("[T]he defendants must be allowed to put forth evidence showing that certain amounts should offset the sanctions assessed against them."). For example, Trudeau might be able to show that he already compensated some customers with full refunds for their purchases.[14] *See Kuykendall*, 371 F.3d at 766. *But see Verity*, 443 F.3d at 69 (placing this burden on the FTC). Also, if the court chooses consumer loss as its baseline, Trudeau

might show that some customers were wholly satisfied with their purchase.[15] *See Kuykendall*, 371 F.3d at 766. Though Trudeau argues that the FTC should bear these burdens, " 'the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.' " *Febre*, 128 F.3d at 535 (quoting *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C.Cir.1989)). In its order, the court must make sufficient factual findings to support its ultimate award. *Mid–Am. Waste Sys.*, 49 F.3d at 293. If consumer loss is the measure, the court must explain what that figure represents: for instance, which consumer purchases are included (e.g., infomercials, retail, or Internet sales) and whether shipping and handling fees are included.[16] If ill-gotten gains is the measure, the court must explain such things as the source of those gains and why those gains are less than gross revenues. And if the court chooses a hybrid approach, *see QT*, 512 F.3d at 864; *Figgie*, 994 F.2d at 601, 607–08, the court should

---

14. We note that a money-back guarantee is not a general defense to a contempt action. *FTC v. Think Achievement Corp.*, 312 F.3d 259, 261 (7th Cir.2002).

15. This should allay Trudeau's concern that he should not have to pay for purchasers who "spurn the opportunity" for a refund. We disagree with Trudeau, however, that the FTC should bear the burden of proving that customers were dissatisfied with their purchases. Just as the FTC is not required to prove individual customer reliance on the defendant's misrepresentations, *see McGregor*, 206 F.3d at 1388; *Figgie*, 994 F.2d at 605; *Sec. Rare Coin*, 931 F.2d at 1316, the FTC is not required to prove individual customer dissatisfaction, *see Kuykendall*, 371 F.3d at 765. "[I]t would be virtually impossible for the FTC to offer such proof, and to require it would thwart and frustrate the public purposes of FTC action." *McGregor*, 206 F.3d at 1388 (quoting *Security Rare Coin*, 931 F.2d at 1316). "To the extent the large number of consumers affected by the defendant['s] deceptive trade practices creates a risk of uncer-

tainty, the defendants must bear that risk." *Kuykendall*, 371 F.3d at 765.

16. Furthermore, if consumer loss is the measure, we agree with our sister circuits that the award amount need not be reduced by the "value" of the books. *See Kuykendall*, 371 F.3d at 766; *McGregor*, 206 F.3d at 1388–89; *Figgie*, 994 F.2d at 606. In unfair and deceptive trade practices cases, the difference between the price paid and the market value of the good bought is irrelevant, "because if the customers had known the truth, they might not have bought any [goods] at all." *Kuykendall*, 371 F.3d at 766 (citing *Figgie*, 994 F.2d at 606). "The fraud in the selling, not in the value of the thing sold, is what entitles consumers in this case to full refunds." *Figgie*, 994 F.2d at 606. Our decision in *SEC v. McNamee*, 481 F.3d 451 (7th Cir.2007), a securities case, in which the ordinary civil remedy was rescission, *id.* at 457, not restitution and disgorgement, *see Febre*, 128 F.3d at 536–37; *FTC v. GEM Merch.*, 87 F.3d 466, 469–70 (11th Cir.1996), does not compel a different result.

address both sets of issues. (We note that these are just some examples, not an exhaustive list, of the types of variables the court might include in its calculations.) Finally, the court may include in its calculation the costs associated with locating and reimbursing defrauded purchasers. *See Kuykendall*, 371 F.3d at 767; *Figgie*, 994 F.2d at 607. Accordingly, we remand for additional findings with respect to the amount of the sanction.

### 2.

Beyond explaining its calculations, the court must also outline how the sanction should be administered. *See Kuykendall*, 371 F.3d at 767. As it stands now, the court's order is silent on this point. The order merely commands Trudeau to pay $37.6 million to the FTC. Simply ordering money to be paid to the U.S. Treasury rather than to reimburse consumers looks more like a criminal fine than a compensatory sanction. *See Bagwell*, 512 U.S. at 834, 114 S.Ct. 2552 ("At no point did the trial court . . . indicate that the fines were to compensate the complainant for losses sustained."). Though we do not question the FTC's integrity in that it will dutifully disperse the proceeds to defrauded book purchasers, we still think it necessary in a contempt sanction of this kind that the court's order specify that the FTC must use the funds to reimburse book purchasers. *See Kuykendall*, 371 F.3d at 767; *see also McDowell v. Phila. Hous. Auth.*, 423 F.3d 233, 241 (3d Cir.2005) (" 'Whether an award in civil contempt be measured in terms of a plaintiff's loss or a defendant's profit, such an award, by very definition, must be an attempt to compensate plaintiff for the amount he is out-of-pocket or for what defendant by his wrong may be said to have diverted from the plaintiff or gained at plaintiff's expense.' " (quoting *Nat'l Drying Mach. Co. v. Ackoff*, 245 F.2d 192, 194 (3d Cir.1957))).

Along these lines, the court should "set forth procedures by which the FTC may . . . reimburse consumers who have established their right to compensation." *Kuykendall*, 371 F.3d at 767. Preferably, the court should order Trudeau to deposit the money in an escrow account, *see Figgie*, 994 F.2d at 605, or into the registry of the court in accordance with 28 U.S.C. § 2041, *see Kuykendall*, 371 F.3d at 767, with instructions on how the FTC can access those funds and disperse them to defrauded consumers. Furthermore, the court should provide that the FTC may use some part of the sanction award to cover the costs of reimbursement, such as locating purchasers and mailing checks. *See id.*; *Figgie*, 994 F.2d at 607.

Finally, Trudeau contends that our decision in *McNamee*, 481 F.3d at 457, compels the district court to include a provision requiring excess money not reimbursed to consumers to be returned back to Trudeau, to avoid any portion of the award becoming punitive rather than compensatory. We disagree. Courts can fashion contempt sanctions based on the defendant's unjust enrichment, even if that amount might exceed the plaintiff's loss. *See Connolly*, 851 F.2d at 932–34. As we have held in direct FTC actions, "[d]isgorgement to the United States Treasury does not transform compensatory damages into punitive damages. . . . [D]isgorgement is designed to be remedial." *Febre*, 128 F.3d at 537; *see also GEM Merch.*, 87 F.3d at 469–70 ("[B]ecause it is not always possible to distribute the money to the victims of defendant's wrongdoing, a court may order the funds paid to the United States Treasury."). *McNamee* does not hold otherwise. That case involved a contempt sanction for a violation of an injunction that prohibited selling unregistered stock, for which the ordinary civil remedy was rescission. 481 F.3d at 457. We re-

versed largely because the district court's sanction failed to resemble rescission in ways that unduly punished the contemnor. *Id. McNamee* never dealt with disgorgement, nor did it foreclose our belief that fraudsters should not be "unjustly enriched by retaining some of their unlawful proceeds by virtue of the fact that they cannot identify all the consumers entitled to restitution," *Febre,* 128 F.3d at 537. As such, to the extent the aggregate amount reimbursed to consumers is less than Trudeau's ill-gotten gains, the district court need not necessarily require that the excess be returned to Trudeau.

We express no opinion, however, on whether the district court must include a return-to-contemnor provision should the court find that Trudeau's unjust enrichment represents only some, or none, of the total sanction amount. The remainder of the sanction could be dedicated to redressing consumer losses, and in such a situation, the logic in *McNamee* might have more force. *See Kuykendall,* 371 F.3d at 756 n. 6 ("[A]ny damages the FTC receives must be distributed to injured consumers and cannot be retained."). But without knowing whether some part of the sanction will not correspond to Trudeau's ill-gotten gains, it would be premature for us to decide that issue today. So we won't.

We remand for the district court to consider how best to administer a compensatory sanction, should it choose to impose one.

**B.**

Beyond attacking the sanction itself, Trudeau wants greater procedural safeguards when that sanction is imposed. Trudeau suggests that on remand he is entitled to a "neutral factfinder" (presumably a jury or at least a different district judge) and a proof-beyond-a-reasonable-doubt standard, even if the district court

imposes a valid *civil* contempt sanction. We disagree.

Trudeau's argument stems from the Supreme Court's decision in *Bagwell,* where the Court concluded the sanction imposed was punitive and thus required criminal process. 512 U.S. at 838, 114 S.Ct. 2552. In dicta, the Court commented on procedures that might be necessary in certain civil contempt cases:

> Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding. . . . [T]he risk of erroneous deprivation from the lack of a neutral factfinder may be substantial. Under these circumstances, criminal procedural protections such as the rights to counsel and proof beyond a reasonable doubt are both necessary and appropriate to protect the due process rights of parties and prevent the arbitrary exercise of judicial power.

*Id.* at 833–34, 114 S.Ct. 2552. Trudeau argues that his is a case of "out-of-court disobedience to [a] complex injunction[ ]" requiring nearly all the trimmings of criminal proceedings.

We find more than a few flaws with Trudeau's reasoning. First, even Trudeau admits that civil contempt is an equitable action, *see In re Grand Jury Proceedings Empanelled May 1988,* 894 F.2d 881, 884 (7th Cir.1989), and litigants have never been entitled to a jury trial for suits in equity, *Verity,* 443 F.3d at 67 (citing *Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)). *See also Shillitani,* 384 U.S. at 365, 86 S.Ct. 1531 ("We hold that the conditional nature of these sentences renders each of the actions a civil contempt proceeding, for which indictment and jury trial are not constitutionally required."); *Daniels v. Pipe Fitters Ass'n,* 113 F.3d 685, 688 (7th Cir.1997) ("Accused contemnors are not

entitled to jury trials before judges may enter remedial civil orders.").  Moreover, we have no indication on this record that the district judge's neutrality is compromised.  Second, we have never adopted the dicta in *Bagwell* and required a more exacting burden of proof on the complainant in a civil contempt proceeding.  Instead, we have held in countless contempt cases involving violations of injunctions that the complainant's burden is one of "clear and convincing evidence."  *E.g., Prima Tek II*, 525 F.3d at 542; *Autotech*, 499 F.3d at 751; *Goluba*, 45 F.3d at 1037.  Third, Trudeau has never been denied counsel in any proceedings, and in fact has been ably represented by more than one prestigious Chicago law firm.  Absent some live controversy on this point, we see no need to determine whether Trudeau has a due process right to counsel in civil contempt proceedings.

Furthermore, we share the Tenth Circuit's skepticism of the feasibility and fairness of varying the process due in civil contempt cases on the "complexity" of the injunction at issue.  In *Kuykendall*, 371 F.3d at 754, the Tenth Circuit sitting en banc rejected the panel's decision to adopt the flexible due process model outlined in *Bagwell*.  The en banc court concluded that "the panel decision would . . . create an exception the district courts would have difficulty applying on many levels, including during the determination of whether an injunction is complex, when a jury is required, and what the jury's burden of proof should be."  *Id.* We echo these concerns and thus refrain from wholeheartedly adopting the Court's dicta in *Bagwell* at this time.

Even if we did, though, we don't think the injunction at issue would trigger the heightened protections.  Trudeau calls his injunction "complex" because the Consent Order was 29 pages long.  But the portion at issue here was just 14 words: "the

infomercial for any such book . . . must not misrepresent the content of the book."  A do-not-deceive order is not overly onerous.  That Trudeau continues to flout such orders and face increasingly stiffer penalties is not a reason to call the injunction "complex."  Moreover, the specific circumstances of this case alleviate some of the concerns the Court expressed in *Bagwell*.  Though Trudeau's violation occurred out of court, the infomercial recordings and transcripts enabled the judge to review the offending conduct first-hand.  So we are confident in concluding that Trudeau is not entitled to any special process on remand.  To be sure, Trudeau is entitled to notice, discovery, and an opportunity to present evidence.  *See Manez*, 533 F.3d at 592; *Autotech*, 499 F.3d at 746–47; *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir.2005).  And Trudeau is entitled to the detailed justification for the court's decision that we outlined above.  But the law does not require more than that for civil contempt sanctions.  Should the government or the district court seek to impose criminal sanctions on remand, a different measure of due process is required.  *See* Fed.R.Crim.P. 42; *Bagwell*, 512 U.S. at 826–27, 114 S.Ct. 2552.

## IV.  The Infomercial Ban

[11]  Finally, Trudeau challenges the district court's three-year ban on Trudeau appearing in infomercials for any product, including books and other publications.  He assails the infomercial ban on two grounds, but we need only address the first.  We agree with Trudeau that the court erred in imposing the ban as a sanction for civil contempt because it fails to give Trudeau an opportunity to purge.  The ban runs for three years regardless of Trudeau's compliance with the underlying order not to misrepresent his books.

Courts have broad discretion to fashion an appropriate remedy for civil contempt. *See Connolly,* 851 F.2d at 933; *see also* 11A WRIGHT, MILLER & KANE, supra § 2960 ("A federal court's discretion includes the power to frame a sanction to fit the violation."). But as explained in our discussion of the monetary penalty, civil contempt sanctions come in two breeds, and two breeds only. They either *compensate* those harmed by the contemnor's violative conduct or *coerce* the contemnor to cut it out. *Bagwell,* 512 U.S. at 828–29, 114 S.Ct. 2552; *Bailey,* 567 F.3d at 933. Otherwise they are criminal sanctions and require criminal process. *Bagwell,* 512 U.S. at 826–27, 831–33, 838, 114 S.Ct. 2552.

[12] The infomercial ban is clearly not compensatory. Whether it's coercive is a somewhat closer question. A coercive sanction seeks to bring the contemnor's conduct into compliance with the court's order. *Id.* at 829, 114 S.Ct. 2552; *In re Grand Jury Proceedings,* 280 F.3d at 1107. In this broad sense, the infomercial ban appears to "coerce" compliance with the 2004 Consent Order prohibiting Trudeau from misrepresenting the content of his books. Trudeau can't produce or participate in deceptive infomercials if he can't produce or participate in any infomercials at all. However, the Supreme Court has made clear that an essential ingredient to any coercive contempt sanction is the opportunity to purge. *Bagwell,* 512 U.S. at 829, 114 S.Ct. 2552 (citing *Penfield,* 330 U.S. at 590, 67 S.Ct. 918). A "purgeable" sanction is one that allows the contemnor to free himself of the sanction "by committing an affirmative act," namely complying with the court's order. *Id.* at 828, 67 S.Ct. 918. "[A] per diem fine imposed for each day a contemnor fails to comply with an affirmative court order" is a purgeable sanction. *Id.* at 829, 67 S.Ct. 918. So is a fixed fine if "imposed and suspended pending future compliance." *Id.* (citing *United Mine Workers,* 330 U.S. at 307, 67 S.Ct.

677). Even imprisonment can be considered coercive, and thus not criminal, if the contemnor can obtain his release through compliance. *See Gompers,* 221 U.S. at 442, 31 S.Ct. 492. But "[t]o the extent that 'a sanction operates whether or not a party remains in violation of the court order, it obviously does not coerce any compliance.'" *Harris v. City of Philadelphia,* 47 F.3d 1311, 1329 (3d Cir.1995) (quoting *In re Magwood,* 785 F.2d 1077, 1082 (D.C.Cir.1986)); *see also Lance v. Plummer,* 353 F.2d 585, 592 (5th Cir.1965) ("[T]he sanction cannot be one that does not come to an end when he repents his past conduct and purges himself.").

The trouble with the infomercial ban is that it lasts for three years no matter what Trudeau does. Trudeau could take all the steps in the world to convince the FTC and the district court that he will be truthful in his next infomercial, but even if he offers to read his book word-for-word and say nothing else, he cannot free himself of the court's sanction. Rather, the three-year ban is like a "prison term[ ] of a definite, pre-determined length without the contemnor's ability to purge," which we have held is "generally considered punitive and therefore criminal contempt." *In re Grand Jury Proceedings,* 280 F.3d at 1108. Simply put, the infomercial ban is not purgeable and therefore not a proper coercive contempt sanction. *See Harris,* 47 F.3d at 1329 (dismissal of defendant's motion to modify decree was not civil sanction because it failed to permit defendant to refile motion should defendant comply); *Lance,* 353 F.2d at 592 (order unconditionally prohibiting deputy sheriff from serving as law enforcement or peace officer not coercive sanction). *But see Gregory v. Depte,* 896 F.2d 31, 34 (3d Cir.1990) (upholding injunction limiting quantity of defendant's future sales as civil because it coerced compliance with previous order, of which court had found defendant in contempt).

The FTC attempts to solve this problem by arguing that the infomercial ban need not be coercive or compensatory because it's not a contempt sanction at all. Rather, in the FTC's view, it's simply a modification of the 2004 Consent Order brought about by the court's granting the FTC's Rule 60(b) motion to modify the Order. (R. 187.) We see a couple of problems with this argument. First, the court never explicitly granted the FTC's motion to modify. The court crafted the infomercial ban in its order on contempt remedies. In fact, the court introduced the ban in the very same sentence as it imposed the original $5.1 million fine. *FTC v. Trudeau*, 572 F.Supp.2d at 925. The court never discussed the FTC's motion or Rule 60(b). Instead, the court cited some classic contempt cases, *id.* at 925–26 (citing *Shillitani*, 384 U.S. at 370, 86 S.Ct. 1531, and *Spallone v. United States*, 487 U.S. 1251, 1255, 1260, 109 S.Ct. 14, 101 L.Ed.2d 964 (1988) (Marshall, J., concurring in denial of stay)), and framed the ban as a vindication of the court's "inherent power to enforce its orders," *id.* at 925. Modifying a court order and enforcing one are two different things—enforcing a court order is achieved through contempt. *See* 11A WRIGHT, MILLER & KANE, *supra*, § 2960. Furthermore, the court's statements in subsequent proceedings confirm that the court intended to impose the infomercial ban as a contempt sanction: "This is not a prior restraint the way we normally look at prior restraints. *This is a remedy for contempt.*" (Hr'g Tr. 4, Sept. 2, 2008) (emphasis added).

Second, there wasn't a peep in the FTC's motion to modify about anything like the three-year infomercial ban the court imposed. The FTC's motion sought two changes to the 2004 Order: (1) to require Trudeau to obtain a $10 million performance bond in connection with pro-

ducing any infomercial; and (2) more stringent compliance reporting requirements. (R. 187.) So we find it hard to hold that the court simply granted the FTC's motion, when the motion never mentioned the remedy the court ultimately imposed.

Finally, even if we construed the court's order as a *sua sponte* modification of the Consent Order (though the district court didn't construe its order this way and though the FTC failed to mention this option in its appellate briefing), we still must reverse. It's true that courts can on their own motion modify or vacate their decrees pursuant to Rule 60(b)(5). *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 866 n. 6 (7th Cir.2005) ("A district court need not wait for the parties explicitly to request such changes; 'the court can on its own motion vacate'—or modify—'the decree pursuant to Rule 60(b)(5).'" (quoting *United States v. Bd. of Educ. of Chi.*, 799 F.2d 281, 297 (7th Cir.1986))). However, we see no indication in the record that Trudeau had any notice that the court was considering such a broad sanction as an outright ban on infomercials; the FTC's motion didn't give any such notice. But notice to the defendant is imperative, particularly when the court is considering a stiffer injunction than the one currently in force or the one proposed in a party's motion to modify. *See W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 109 (5th Cir. 1994) (notice required for modification of injunction imposed *sua sponte*, despite defendants' motion for relief from injunction, because modification was more stringent than relief defendants requested). So in short we cannot construe the ban as arising from some modification of the 2004 Consent Order; rather the court imposed it as a sanction for Trudeau's contempt.

Though we might be able to modify the infomercial ban on our own to fashion a proper coercive contempt remedy, *see*

ROBY v. CWI, INC. **779**
Cite as 579 F.3d 779 (7th Cir. 2009)

*Lance*, 353 F.2d at 592 (modifying order to incorporate purge provision allowing ex-deputy sheriff to be reinstated as law enforcement or peace officer upon district court's satisfaction that ex-deputy was no longer in violation of original order and would in good faith comply with order), we decline to do so here. The district court is in a better position to fashion an appropriate coercive remedy, should it choose to do so on remand. The court could also, of course, choose to impose a criminal sanction instead. Or the district court could modify the Consent Order, on motion from the FTC or on its own motion, provided it give Trudeau sufficient notice and an opportunity to be heard on the matter. But it cannot impose a non-purgeable, three-year penalty as a civil contempt sanction. Accordingly, we vacate the infomercial ban and remand.

### V. Conclusion

We AFFIRM the district court's finding Trudeau in contempt of the 2004 Consent Order. However, we VACATE the monetary sanction and the infomercial ban and REMAND for further proceedings consistent with this opinion.



**Misty ROBY, Plaintiff–Appellant,**

**v.**

**CWI, INC. d/b/a Camping World, Inc., a Kentucky corporation, Defendant–Appellee.**

**No. 08–3513.**

United States Court of Appeals, Seventh Circuit.

Argued May 7, 2009.

Decided Aug. 27, 2009.

**Background:** Former employee brought action against former employer, alleging that she was sexually harassed by a supervisor and subjected to retaliation for her complaints. The United States District Court for the Northern District of Illinois, Samuel Der'Yeghiayan, J., 2008 WL 4211689, granted summary judgment in favor of employer. Employee appealed.

**Holdings:** The Court of Appeals, Lawrence, District Judge, sitting by designation, held that:

(1) there was insufficient evidence that employee suffered a constructive discharge;

(2) employer established affirmative defense to hostile work environment claim;

(3) employee failed to establish prima facie case of retaliation; and

(4) even if employee had established prima facie case, employer demonstrated legitimate, non-retaliatory justification.

Affirmed.

**1. Civil Rights** ⟜1185

One of the ways in which sex-based workplace discrimination prohibition can be violated is through sexual harassment that is either severe or pervasive enough to create an abusive working environment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1).

**2. Civil Rights** ⟜1185

To withstand summary judgment on claim of sex-based hostile work environment, employee must demonstrate that (1) she was subjected to unwelcome conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1).